1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JENNIFER WYSOCKI, | CASE NO. 3:22-cv-05453-DGE |
| Plaintiff, | ORDER ON MOTION TO STRIKE CLASS ALLEGATION AND MOTIONS TO DISMISS (DKT. NOS. 21, 22, 78) |
| v. | |
| ZOOM TECHNOLOGIES INC et al., | |
| Defendants. | |

## I INTRODUCTION

This matter comes before the Court on Defendants' Motion to Strike Class Allegations (Dkt. No. 21) and Motion to Dismiss (Dkt. No. 22) which Defendants renewed (Dkt. No. 78). Upon review of those motions, the Plaintiffs' responses (Dkt. Nos. 37, 38, 91), Defendants' replies (Dkt. Nos. 45, 46, 97), and the remainder of the record, the Court finds as follows.

## II BACKGROUND

This class action alleges violations of the Wiretap Act (18 U.S.C. § 2510, *et seq.*), the Stored Communications Act (18 U.S.C. § 2701 *et seq.*), and various consumer fraud and privacy

laws in Washington, California, Florida, New York, Illinois, Connecticut, and Georgia.  (Dkt. No. 19 at 29–63.)  The dispute arises from the alleged unauthorized obtaining of Plaintiffs' personal and professional contact information.

Defendants are ZoomInfo Technologies Inc., ZoomInfo Technologies LLC, ZoomInfo Holdings LLC, and ZoomInfo Intermediate Inc. (collectively, "ZoomInfo").  ZoomInfo is a public company offering for sale access to its proprietary database of information and analytic tools.  (Dkt. No. 19 at 3.)  ZoomInfo's database contains intelligence about business entities and individuals, including personnel moves, organizational charts, intent signals, decision-maker contact information, hierarchy information and other financial details.  (*Id.*)  ZoomInfo claims its database contains more than 50 million contact details, which are updated daily by artificial intelligence, as well as a team of over 300 human researchers and analysts.  (*Id.*)

There are two ways users can access ZoomInfo's database: through a paid subscription, or via ZoomInfo's Community Edition Program ("CEP").  (*Id.*)  CEP offers users free access to the database in exchange for the users' participation in the program.  The user agrees to certain terms and conditions, then downloads and installs a local software application called Contact Contributor ("CC") which integrates into the user's mail software.  (Dkt. No. 22 at 11.)  Once installed, CC will scan the user's address books, email headers, and signature blocks of email messages for business contact information, like the company and office address, phone number, email address, and the position or title of the person.  (*Id.*)  CC "scrapes" for contact information not only from the person who installed CC, but also persons who have emailed the user who installed CC.  (Dkt. No. 19 at 3.)  For example, Plaintiffs Wysocki and Sidhu have not subscribed to the CEP and have not installed CC.  (*Id.*)  Yet Wysocki and Sidhu's details—their full name, title, years of experience, employment history, names of work colleagues,

geographical information—have been displayed in the database without their knowledge or consent.  (*Id.* at 3–4.)

Plaintiffs allege ZoomInfo intercepts, views, reads, and accesses users' electronic email communications and subsequently discloses, disseminates, sells, and otherwise uses individual personal information CC "scraped" off their personal email correspondence without informing them.  (*Id.* at 5.)  Plaintiffs also believe ZoomInfo fails to meaningfully disclose its use of "hundreds of human researchers and analysts to cleanse, organize, and verify personal information" collected, "which it then sells to third parties, such as marketers, recruiters, and advertisers."  (*Id.*)  According to Plaintiffs, "[e]ach such interception and disclosure constitute[s] an egregious breach of social privacy norms and is a violation of federal and state law."  (*Id.* at 6.)

ZoomInfo sends to non-users an email (the "Privacy Notice") notifying them of the "collection, processing, and sale of certain personal information or personal data."  (*Id.* at 18.)  According to Plaintiffs, the Privacy Notice "is designed to never reach its recipients."  (*Id.* at 19.)  While ZoomInfo sends their regular communication through a domain name that reaches 95% of its audience, the Privacy Notice is sent from a different domain name, reaching as little as 5% of the recipients' inboxes, which Plaintiff alleges is by design.  (*Id.*)  Users are permitted to opt out of the database by clicking a hyperlink, providing their email address, and completing a verification via email.  (*Id.*)  ZoomInfo states it "cannot guarantee that other data providers will see or honor your opt-out request."  (*Id.*)

ZoomInfo filed a motion to dismiss arguing Plaintiffs' theory seems to be based on an unsupported inferential leap that ZoomInfo "reads" the emails just because Plaintiffs' information appears in ZoomInfo's database; ZoomInfo believes its Terms of Use and other

public disclosures describe exactly what it does—and exactly what Plaintiffs are complaining of—and Plaintiffs' factual allegations thus entirely fail to support their theory of the case.  (Dkt. No. 22 at 10.)

Additionally, ZoomInfo points out the complaint makes claims under the laws of several states for which there is no named plaintiff representative, requiring dismissal of the California, Florida, New York, and Illinois claims.  (*Id.*)  According to ZoomInfo, each claim fails as a matter of law because Plaintiffs have not alleged (and cannot allege) the elements of any of the claims they assert.  (*Id.*)  Finally, ZoomInfo argues the complaint fails to specify which of the four Defendants stands accused of each of the alleged acts, depriving Defendants of notice under Rule 8.  (*Id.*)  Later, ZoomInfo filed a "renewed" motion to dismiss, asserting in depth an argument made only briefly in the original motion: Plaintiffs' lack of standing.  (*See* Dkt. Nos. 22 at 29, 78 at 5.)  ZoomInfo argues Plaintiffs lack standing because they have no injury as the same information posted on the database is publicly available elsewhere on the internet, including LinkedIn, attorney directory websites, government websites, and company websites. (Dkt. No. 78 at 10–13.)

Filed simultaneously with the original motion to dismiss was Defendants' motion to strike class allegations pursuant to Rules 12(f) and 23(c).  (Dkt. No. 21.)  ZoomInfo argues Plaintiffs are not adequately represented due to a divergence of interests.  (*Id.* at 4.)  Plaintiffs include two classes: subscribers who participate in CEP and download and authorize CC ("Subscribers"), and people who have not subscribed to CEP nor authorized CC (Non-Subscribers).  (*Id.*)  Because the complaint alleges ZoomInfo obtained Non-Subscribers' information from Subscribers, ZoomInfo argues the two classes are pitted against each other, and each class therefore lacks adequate representation under Rule 23.  (*Id.* at 5.)  ZoomInfo's motion

1    to strike asserts again the same argument in their motion to dismiss: there is no named plaintiff to

2    represent the subclasses required for certain state law claims.  (*Id.*)  Because classes (and

3    subclasses) must be represented by a named plaintiff who is part of that class (or subclass),

4    ZoomInfo requests those allegations brought on behalf of subclasses for which there is no named

5    plaintiff be stricken.  (*Id.*)

6    ## III       DISCUSSION

7    Defendants' motion to dismiss arguments fall into three categories: (1) Plaintiffs have

8    asserted claims based on state law where there is no representative Plaintiff from that state; (2)

9    the complaint does not comply with Rule 8 by failing to distinguish among Defendants; and (3)

10   Plaintiffs' claims all separately fail as a matter of law.  (*See* Dkt. No. 22 at 15–31.)  Defendants'

11   motion to strike challenges the classes in two ways: (1) all class allegations should be stricken

12   because the adequacy prong of Rule 23(a)(4) cannot be met; and (2) the court should strike

13   classes for which there is no named plaintiff.  (*See* Dkt. No. 21 at 5–8.)

14   Before addressing the merits of these arguments, the Court notes some formalistic

15   disputes.  First, Plaintiffs argue the motion to strike class allegations should be stricken in its

16   entirety for violating Local Rule 7(e), which provides: "[a]bsent leave of the court, a party must

17   not file contemporaneous dispositive motions, each one directed toward a discrete issue or

18   claim."  LCR 7(e)(3).  ZoomInfo's presentation of these issues in two separate motions is

19   certainly inefficient, but not so clearly in violation of the rule that striking the subsequent motion

20   is necessary.  The Court is not convinced a motion to strike class allegations necessarily

21   constitutes a "dispositive" motion.  *See, e.g.*, *Audionics Sys. Inc. v. AAMP of Fla. Inc.*, No. CV

22   12-10763 MMM (JEMx), 2013 WL 12131350, at *2 (C.D. Cal. Dec. 10, 2013) (treating a

23   motion to strike affirmative defenses as a non-dispositive motion).  Nor would striking the

24

1    motion reflect the spirit of the rule, which is to prevent parties from circumventing length

2    requirements on dispositive motions.[1]  *See Avocent Redmond Corp. v. Rose Elecs.*, No. C06-

3    1711RSL, 2012 WL 2916327, at *1 (W.D. Wash. July 6, 2012) (quoting language of previous

4    iteration of the rule: "the filing of multiple dispositive motions to avoid the page limits of this

5    rule is strongly discouraged[.]")  Plaintiffs' request to strike the contemporaneous filing under

6    LCR 7(e)(3) is **DENIED**.

7        Notably, Defendants' argument to eliminate the claims coming from states with no

8    Plaintiff representative is repeated both in its motion to dismiss and motion to strike class

9    allegations.  In reply to the motion to dismiss, ZoomInfo argues Plaintiffs "conflate this issue

10   with the issue of class representation" and points out Plaintiffs improperly cite the argument as

11   "a Rule 23 challenge" which ZoomInfo believes is "wrong."  (Dkt. No. 45 at 8.)  But in its

12   motion to strike, ZoomInfo frames the issue as a Rule 23 challenge, explaining the

13   appropriateness of a Rule 23 challenge at the pleadings stage, arguing the court should strike

14   classes for which there is no named plaintiff under a subheading challenging the adequacy of the

15   class under Rules 12(f) and 23(c).  (Dkt. No. 21 at 8–11.)  In this way, ZoomInfo encroaches on

16   abusing the local rules by filing two different motions challenging the sufficiency of the

17   complaint using the same argument, then making the procedural basis for the argument a moving

18   target between the two motions for Plaintiffs to try to catch.  The Court views the issue in the

19   light favorable to the non-moving Plaintiffs in determining whether a Rule 23 adequacy

20   challenge asserted on a motion to strike is appropriate in this instance.

21

22

---

23   [1] ZoomInfo could not have filed the motion to strike to circumvent the length requirement

24   because its original motion already does not comply with the length requirement by around 1000 words (and fails to certify the number of words).  LCR 7(e)(3), (e)(6).

ORDER ON MOTION TO STRIKE CLASS ALLEGATION AND MOTIONS TO DISMISS (DKT. NOS. 21, 22, 78) - 6

1       A. **<u>Motion to Strike</u>**

2       Defendants argue both that the Court should strike subclasses for which there is no

3 named plaintiff and that the classes do not meet the adequacy prong of Rule 23(a)(4) due to

4 conflicts of interests between the classes. (*See* Dkt. No. 21 at 8–10.)

5       Plaintiffs maintain these arguments should not be presented on a motion to strike, and

6 instead, "a motion for class certification is a more appropriate vehicle." (Dkt. No. 38 at 10)

7 (citing *Lyons v. Coxcom Inc.*, 718 F. Supp. 2d 1232, 1235–36 (S.D. Cal. 2009) (quoting *Thorpe*

8 *v. Abbott Labs., Inc.*, 534 F. Supp. 2d 1120, 1125 (N.D. Cal. 2008))). Plaintiffs argue striking

9 class allegations at the pleading stage is disfavored because a "rigorous analysis" of the Rule 23

10 requirements can only be conducted based on discovery and development of the record. (*Id.*)

11 Because of this, granting a motion to strike class allegations prior to discovery is considered

12 "rare" and oftentimes "premature." (*Id.*) (citing *In re Wal-Mart Stores, Inc.*, 505 F. Supp. 2d

13 609, 615–16 (N.D. Cal. 2007) and *Cruz v. Sky Chefs, Inc.*, 2013 WL 1892337, at *6–7 (N.D. Cal.

14 May 6, 2013)). Defendants agree the norm is to present these issues at the class certification

15 stage, not the pleading stage. (Dkt. No. 21 at 8.) Defendants believe this situation is an

16 exception to the rule, where "the issues are plain enough from the pleadings to determine

17 whether the interests of the absent parties are fairly encompassed within the named plaintiff's

18 claim[.]" (*Id.*); *General Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

19       Defendants cite three cases to support striking class deficiencies before the certification

20 stage. (Dkt. No. 46 at 7–8) (citing *Pardini v. Unilever U.S., Inc.*, 961 F. Supp. 2d 1048, 1061

21 (N.D. Cal. 2013), *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 991 (N.D. Cal. 2009), and *Bates v.*

22 *Bankers Life & Casualty Co.*, 993 F. Supp. 2d 1318, 1342 (D. Or. 2014), *aff'd*, 716 F. App'x 729

23 (9th Cir. 2018)).

24

1      *Pardini* did not involve a motion to strike, but rather a motion to dismiss for failure to

2 state a claim. *See Pardini*, 961 F. Supp. at 1051. While *Sanders* did determine the motion was

3 not premature and could be considered on a motion to strike, the court set forth little by way of

4 analysis for this decision. *See Sanders*, 672 F. Supp. 2d at 991 (Noting only "[i]n this instance,

5 this Court concludes that the motion is not premature."). Neither is particularly instructive as a

6 result.

7      *Bates* provides more insight. The class action plaintiffs in *Bates* sued an insurance

8 company for the mishandling of claims. 993 F. Supp. 2d 1318 at 1328–1329. Plaintiffs

9 proposed three separate classes of named and absent plaintiffs: Oregonian policy-holders whose

10 claims have been mishandled by the insurance company through a combination of delay and

11 nonpayment of claims between 2005 and the present, notwithstanding timely payment of all

12 policy premiums ("Class A"); family members and other representatives of such policy-holders

13 who have incurred expenses in the course of attempting to obtain benefits for their policy-holder

14 family members under their policies ("Class B"); and Oregonian policy-holders who have paid

15 all policy premiums on a timely basis and who have not yet filed any claim under their policies

16 ("Class C"). *Id.* at 1329. Defendants' motion to strike argued each plaintiff's situation with the

17 insurance company was different, and therefore no plaintiff's claims are "typical" of all

18 plaintiffs' claims, failing to meet the typicality requirement of Rule 23(a)(3). *Id.* at 1341.

19 Plaintiffs argued the issue should be deferred to the class certification stage. *Id.* at 1342. The

20 court determined even if discovery were to establish the insurance company's policy of improper

21 delay and denial of claims, the discovery would not obviate the need for individual inquiry

22 because the misconduct and resulting damages would be different for every plaintiff depending

23 on the facts of each instance. *Id.*

24

Here, because there are two challenges—one for these classes and another for the state subclasses— the Court will consider each argument under *Bates* and determine to what extent discovery is necessary to resolve the facts underlying the argument.

ZoomInfo's decision to request review of the class on a 12(f) motion to strike, however, binds the analysis to a much less thorough and rigorous review than after a motion for certification is filed. *See generally Leo v. AppFolio, Inc.*, No. 17-5771 RJB, 2018 WL 623647, at *5 (W.D. Wash. Jan. 30, 2018). In the context of a motion to certify a class, it is the plaintiffs who bear the burden to establish that the class is certifiable. "However, in the context of a motion to *strike* class allegations, in particular where such a motion is brought in advance of the close of class discovery, it is properly the defendant who must bear the burden of proving that the class is *not* certifiable." *Bates*, 993 F. Supp. 2d at 1340–1341.

Rule 12(f) authorizes the court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial[.]" *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) (citations omitted), *overruled on other grounds*, 510 U.S. 517 (1994). As with motions to dismiss, when ruling on a motion to strike, the Court takes the plaintiff's allegations as true and must liberally construe the complaint in the light most favorable to the plaintiff. *See Farm Credit Bank of Spokane v. Parsons*, 758 F. Supp. 1368, 1371 n.4 (D. Mont. 1990) (citing 2A Moore's Federal Practice ¶ 12.21[3]). Leave to amend must be granted unless it is clear the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995).

1          1.   Subscriber and Non-Subscriber class conflicts of interest

2          First, ZoomInfo argues the classes fail to meet the adequacy prong of Rule 23(a)(4)

3    because the classes have competing interests.  (Dkt. No. 21 at 8–9.)  Rule 23 allows one or more

4    plaintiffs to sue as representative parties on behalf of all class members only if (1) the class is so

5    numerous that joinder of all members is impracticable; (2) there are questions of law or fact

6    common to the class; (3) the claims or defenses of the representative parties are typical of the

7    claims or defenses of the class; and (4) the representative parties will fairly and adequately

8    protect the interests of the class.  Fed. R. Civ. P. 23(a).

9          To determine adequacy under the fourth prong, courts resolve two questions: "(1) do the

10   named plaintiffs and their counsel have any conflicts of interest with other class members and (2)

11   will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the

12   class?" *Anders v. California State Univ., Fresno*, No. 23-15265, 2024 WL 177332, at *1 (9th

13   Cir. Jan. 17, 2024) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

14   Under the first question, to defeat adequacy, a conflict must be "actual" and not merely

15   "speculative." *Id.* at *2 (citing *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003)).  An

16   actual conflict exists if the remedy sought precludes "structural assurance of fair and adequate

17   representation for the diverse groups and individuals affected." *Id.* (citing *Amchem Prods., Inc.*

18   *v. Windsor*, 521 U.S. 591, 627 (1997)).

19         ZoomInfo argues the Subscribers and Non-Subscribers are "in an untenably antagonistic

20   position relative to each other." (Dkt. No. 21 at 9.)  The Non-Subscribers allege harm suffered

21   from ZoomInfo's collection of their information via Subscribers.  Because Subscribers

22   voluntarily downloaded CC and consented to the collection of the information, their interests are

23   at odds with the Non-Subscribers.  This is particularly so, ZoomInfo argues, because the

24

ORDER ON MOTION TO STRIKE CLASS ALLEGATION AND MOTIONS TO DISMISS (DKT. NOS. 21, 22, 78) - 10

Subscribers, when they agreed to the Terms of Use, agreed to indemnity ZoomInfo for these types of claims.  (*Id.*)  In the Terms of Use, Subscribers "represent and warrant that you have the right to provide us with this information[,]" information being "information in signature blocks of emails you have received, metadata from email headers, and your contacts in your email contact book."  (Dkt. No. 19 at 68.)  The indemnification clause states: "[y]ou further agree to indemnify and defend ZoomInfo and hold ZoomInfo harmless from and against any liability arising from ZoomInfo's use or distribution of any such material or information."  (*Id.* at 71.) The indemnification clause follows a subheading labeled "SUBMISSIONS" detailing Subscribers being "solely responsible for the content of any submission you make to ZoomInfo" and agreeing to grant ZoomInfo certain rights over "information or material you send to ZoomInfo[.]"  (*Id.*)

Plaintiffs argue Subscribers did not "send" anything to ZoomInfo and instead, "unbeknownst to Subscribers[,]" ZoomInfo extracts their information from their email correspondence without their knowledge.  (Dkt. No. 38 at 11.)  "Because Subscribers do not know that ZoomInfo reads their email communications and then extracts and discloses the contents thereof, they cannot possibly consent to indemnifying ZoomInfo."  (*Id.*)  Plaintiffs support the argument with the following sentence from the complaint: "ZoomInfo also fails to inform individuals that ZoomInfo does, in fact, view the entirety of Subscribers' incoming and outgoing communications to extract and include information in their database."  (Dkt. No. 19 at 50.)  Plaintiffs also assert Subscribers and Non-Subscribers allege the same misconduct and harm: that ZoomInfo intercepts, reads, scans, and discloses the contents of email communications causing both classes harm to their privacy interests, loss of private and

1   confidential information, and injury to their dignity, well-being, and security.  (Dkt. No. 38 at

2   10–11.)

3          To say Subscribers were not aware ZoomInfo would be extracting information in

4   signature blocks of emails and contact books seems disingenuous.  The purpose of CEP is to

5   exchange exactly this information for a free subscription to the database.  Subscribers agreed to

6   the Terms of Use, which outlines quite clearly what information ZoomInfo would be accessing

7   through the installation of CC on a Subscriber's email.  The two groups do share some harm

8   from the same alleged misconduct.  Taking the allegations in the complaint as true, ZoomInfo is

9   viewing, reading, and accessing *more* information sent by Non-Subscribers and received by

10  Subscribers than is outlined its Terms of Use disclose.  And, despite ZoomInfo's assurance that

11  no one is reading the private email messages, some downloaded emails are quality-checked by

12  human researchers to separate the email message from the business information and verify CC

13  extracted the right information.  (Dkt. No. 19 at 12.)

14         But ZoomInfo is correct that the two groups diverge in one instance: Non-Subscribers'

15  information was obtained and posted on ZoomInfo's database without their consent.

16  Subscribers' information was obtained and posted on the database with their consent, and

17  Subscribers "consented" on behalf of Non-Subscribers by granting ZoomInfo access to Non-

18  Subscribers' information.  In this regard, Non-Subscribers suffered a different harm than

19  Subscribers.  Whether this difference rises to the level of a conflict is another question likely

20  depending on the extent and applicability of the indemnity provision and what information was

21  actually obtained.  For example, if ZoomInfo's disclosures are misleading and thus violate the

22  pertinent consumer protection and privacy statutes, Subscribers are likely not responsible for

23  indemnifying ZoomInfo, as CEP and CC were misrepresented to Subscribers when they agreed

24

1   to the Terms of Use.  But Subscribers are potentially responsible in some respect for providing

2   Non-Subscribers' information to ZoomInfo.  In agreeing to the Terms of Use, Subscribers

3   "represent and warrant that [Subscribers] have the right to provide [ZoomInfo] with this

4   information."  (Dkt. No. 19 at 68.)  This certainly raises questions as to whether the two groups

5   have competing interests.

6          The Court finds this discrepancy is not one that can be addressed before the class

7   certification stage under *Bates*.  Despite ZoomInfo's assertion to the contrary, this issue is not

8   "plain enough from the pleadings" to decide whether the competing class interests warrant

9   striking class allegations from the complaint.  *General Telephone Co. of Sw. v. Falcon*, 457 U.S.

10  147, 160 (1982).  There is additional discovery and argument to be had, including determining

11  the scope of the indemnification provision and the differences in harm and remedy sought

12  between the Subscriber and Non-Subscriber class.  The Defendants' motion to strike class

13  allegations on this basis is **DENIED.**

14              2.   <u>State subclasses for which there is no named plaintiff</u>

15         Next, Defendants assert there is no named plaintiff who is a resident of Washington,

16  Florida, New York, or Illinois; they also argue the alleged California plaintiff was a Subscriber,

17  where the California subclass encompasses only "individuals who reside in the State of

18  California who did not subscribe to ZoomInfo's Community Edition."  (Dkt. No. 21 at 10–11.)

19         Defendants cite *Keegan v. American Honda Motor Co.*, in which plaintiffs brought a

20  class action as individuals who purchased or leased certain defective vehicles under state product

21  liability statutes. (Dkt. No. 46 at 10); 838 F. Supp. 2d 929, 933 (C.D. Cal. 2012).  One of those

22  statutes was the Song-Berly Consumer Warranty Act of California, which requires the good at

23  issue be purchased in California.  *Id.* at 944.  Defendants challenged plaintiffs' ability to bring

24

claims under the act because none of them purchased their cars in California.  *Id.* at 945 n.51.

Plaintiffs argued the "named plaintiffs who purchased their cars out-of-state can represent a

proposed California sub-class."  *Id.*  The Court explained: "This is incorrect. To represent a

subclass under Rule 23(a)'s typicality requirement, the subclass representative must be a member

of the subclass he or she seeks to represent."  *Id.*  "Thus, plaintiffs who did not purchase their

cars in California cannot represent a subclass of individuals who did."  *Id.*

Plaintiffs argue if a named plaintiff has standing, then questions about the ability of the

plaintiff to represent a class (and the scope of the class) present issues for certification, not

striking.  (Dkt. No. 38 at 12.)  They argue "since the parties have yet to develop a factual record,

it is unclear at the pleading stage whether applying different state consumer protection statutes

could have a material impact on the viability of Plaintiffs' claims."  (*Id.*)  According to Plaintiffs,

"[a]t the pleading stage, the only question before the court is whether the named plaintiff

suffered an injury, while deferring 'questions of sufficient similarity to the class certification

stage.'"  (*Id.*)  (citing *Trazo v. Nestle USA, Inc.*, No. 5:12–CV–2272 PSG, 2013 WL 4083218, at

*4 (N.D. Cal. Aug. 9, 2013)).

Plaintiffs' standing argument misses the mark.  Standing presents a separate issue to class

representatives under Rule 23(a).  After finding plaintiffs had standing, the *Trazo* court went on

to grant Nestle's motion to strike class allegations due to a commonality defect.  *Id.* at *13.  Each

subclass must independently meet the requirements of Rule 23 to maintain a class action.  *Betts

v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).  There is a

"fundamental requirement that the representative plaintiff must be a member of the class he

represents[,]" and of particular importance is certainty "each subclass is adequately represented."

*Id.*  In this way, the litigation as to each subclass is treated as a separate lawsuit.  *Id.* (citing *In Re*

1   *General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1117–1118, n.11 (7th Cir.

2   1979); *cert. denied*, 444 U.S. 870).  Such an analysis is capable of resolution on the face of the

3   complaint without further discovery.

4   Plaintiffs Wysocki and Sidhu are citizens of Connecticut.  (Dkt. No. 19 at 8.)  Plaintiff

5   Kellogg is a citizen of California. (*Id.* at 9.)  Plaintiff Flemister is a citizen of Georgia.  (*Id.*)

6   There is no named Plaintiff who is a resident or citizen of Washington, Florida, New York, or

7   Illinois, and yet these subclasses each include "[a]ll individuals who reside in" each state.  (*Id.* at

8   26.)  Other than their misplaced reliance on standing, Plaintiffs make no argument as to why the

9   state claims for which there is no plaintiff representative should not be stricken.

10  Defendants also point out the language describing the California subclass is exclusive to

11  Non-Subscribers: "[a]ll individuals who reside in the State of California who did not subscribe to

12  ZoomInfo's Community Edition and whose email correspondence was viewed, read, processed,

13  captured and/or shared by ZoomInfo with third parties without their consent as a result of their

14  corresponding with any Member of the Subscriber Class during the applicable statute of

15  limitations period."  (*Id.*)  Defendants argue Plaintiff Kellogg cannot represent this subclass

16  because she was a subscriber.  (*Id.* at 9) ("Plaintiff Kellogg is a natural person and citizen of the

17  State of California. Plaintiff is a subscriber of ZoomInfo.").  As explained below in Section B(1)

18  (*Article III standing*), while Kellogg subscribed to access to the ZoomInfo database, it was not

19  through CEP.  (Dkt. No. 80 at 2, 7.)  The California subclass includes those who did not

20  subscribe **to ZoomInfo's Community Edition** . . . ."  (*Id.* at 26.)  Kellogg is an individual who

21  resides in the California who, although she subscribed to ZoomInfo's database access, did not

22  subscribe to ZoomInfo's CEP, and therefore she is properly a member of the subclass.

23

24

Defendants' argument is well-taken and its motion to strike the Washington, Florida, New York, and Illinois subclasses and claims is **GRANTED**; Defendants' motion to strike the California subclass and claims is **DENIED.**

## B.  Motion to Dismiss

Fed. R. Civ. P. 12(b) motions to dismiss may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.  *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990).  Material allegations are taken as admitted and the complaint is construed in the plaintiff's favor.  *Keniston v. Roberts*, 717 F.2d 1295, 1300 (9th Cir. 1983).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.*  The complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.

Because the first argument in ZoomInfo's motion to dismiss was addressed in its motion to strike, the Court addresses only the remaining arguments: first, as stated in the renewed motion to dismiss, Plaintiffs lack Article III standing; second, Plaintiffs' claims all separately fail as a matter of law; and third, the complaint does not comply with Rule 8 by failing to distinguish which Defendants committed which alleged acts.

### 1.  Article III standing – Wiretap Act and Stored Communications Act

Standing requires three things: (1) the plaintiff must have suffered an "injury in fact"—an

1    invasion of a legally protected interest which is concrete, particularized, actual, and imminent;

2    (2) there must be a causal connection between the injury and the conduct complained of,

3    meaning the injury has to be "fairly traceable" to the challenged conduct of the defendant and not

4    the result of some third party not before the court; (3) it must be likely, as opposed to merely

5    speculative, that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of*

6    *Wildlife*, 504 U.S. 555, 560–561 (1992).  Plaintiffs, as the party invoking federal jurisdiction,

7    bear the burden of establishing standing.  *Id.* at 561; *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231

8    (1990).

9         There are two approaches to challenging standing: a facial challenge and a factual

10   challenge.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  In a facial attack, the challenger

11   asserts that the allegations contained in a complaint are insufficient on their face to invoke

12   federal jurisdiction.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In a

13   factual attack, the challenger disputes the truth of the allegations that, by themselves, would

14   otherwise invoke federal jurisdiction.  *Id.*  In the latter situation, the Court is permitted to look

15   "beyond the complaint[,]" because the issue surpasses a mere pleading deficiency.  *Savage v.*

16   *Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036, 1039 n.2 (9th Cir.

17   2003) *cert. denied,* 541 U.S. 1009 (2004).  Once the moving party has converted the motion to

18   dismiss into a factual motion by presenting affidavits or other evidence, the party opposing the

19   motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing

20   standing.  *Id.*

21        ZoomInfo has asserted a factual challenge.  (Dkt. No. 78 at 8.)  Plaintiffs must present

22   sufficient evidence outside the complaint showing injury, causation, and redressability as to each

23   Plaintiff—Wysocki, Sidhu, Flemister, and Kellogg.

24

ORDER ON MOTION TO STRIKE CLASS ALLEGATION AND MOTIONS TO DISMISS (DKT. NOS. 21, 22, 78) - 17

In the parties' briefing, there appears to be some misunderstanding as to what the Plaintiffs allege as their injury. Defendant points out in many cases, the business information on ZoomInfo's database is posted publicly on other websites like LinkedIn, business directories, or state government websites. (*See, e.g., Id.* at 10.) Because Plaintiffs' information is otherwise publicly available, the posting of the same information on ZoomInfo's database cannot be a cognizable injury. In Plaintiff's response, they clarify: "the complaint does allege that ZoomInfo published Plaintiffs' information . . . [these are] not the injuries giving rise to Plaintiffs' claims nor the injuries which Plaintiffs seek to remedy via this Action." (Dkt. No. 94 at 13) (citations omitted). "Plaintiffs do not bring a claim for defamation, or any other claim requiring publication as an element. The conduct that Plaintiffs challenge is the unlawful interception of their emails by ZoomInfo." (*Id.*) The Court analyzes standing for each named Plaintiff based on this claimed injury.

Plaintiffs Wysocki and Sidhu's allegations are substantially similar and can be addressed together. Both Wysocki and Sidhu's information appeared on the database despite them never giving that information to ZoomInfo, never subscribing to CEP, and never downloading CC. (Dkt. No. 19 at 3.) ZoomInfo published some information likely found in email headers or signatures, but some information perhaps would not be; for example, Wysocki's full name, title, years of experience, names of work colleagues, geographical information, and her personal mobile number, which she does not use for work. (*Id.* at 3, 23.) Similarly, Sidhu's full name, employment history, names of his work colleagues, and geographical information are posted. (*Id.* at 3.) Both Plaintiffs use their email for work communications with clients and colleagues, the content of which is confidential (and, in the case of Wysocki, an attorney, covered by

1    attorney-client privilege).  (*Id.* at 23–24.)  ZoomInfo's records reveal Wysocki and Sidhu's

2    information was gathered via CC.  (Dkt. No. 94 at 8–10.)

3          Both Wysocki and Sidhu bring claims for violation of the Wiretap Act and the Stored

4    Communications Act. (Dkt. No. 19 at 29–35).  Wysocki and Sidhu must have suffered an "injury

5    in fact"—an invasion of a legally protected interest which is concrete, particularized, actual, and

6    imminent.  Under each of these statutes, Wysocki and Sidhu have not suffered an invasion of a

7    legally protected interest.

8          Plaintiffs' Wiretap Act claim alleges ZoomInfo intentionally intercepted the content of

9    Plaintiffs' electronic communications without obtaining actual consent from any authorized party

10   to the electronic communication.  (*Id.* at 30–31.)  Notably, under the Wiretap Act, this type of

11   interception is not unlawful where the interceptor "is a party to the communication or where one

12   of the parties to the communication has given prior consent to such interception[.]"  18 U.S.C.

13   § 2511(2)(d).  Here, Subscribers consented to ZoomInfo intercepting and "scraping" certain

14   information from their emails.  So, to the extent ZoomInfo obtained the information exactly in

15   the way it represented in the Terms of Use, Subscribers—who are one party to each email

16   communication—gave prior consent to the interception under the Wiretap Act.  While it is

17   clearly possible ZoomInfo obtained this information by doing *more* than it disclosed to

18   Subscriber, Wysocki and Sidhu are not Subscribers; they did not agree to the Terms of Use or

19   Privacy Policy, they did not review and accept any of the agreements Subscribers did.  They

20   have no legally protected interest in these agreements.  As non-parties to these agreements

21   between Subscribers and ZoomInfo, Wysocki and Sidhu do not have standing to enforce the

22   Terms of Use against ZoomInfo.

23

24

1      Similarly, the Stored Communications Act prohibits the intentional access without

2  authorization of a facility through which an electronic communication service is provided.  18

3  U.S.C. § 2701(a); (Dkt. No. 19 at 34.)  This provision "does not apply with respect to conduct

4  authorized [] by a user of that service with respect to a communication of or intended for that

5  user[.]"  18 U.S.C. § 2701(c)(2).  Subscribers, as "users" of the CEP service, provided

6  authorization for ZoomInfo to obtain certain information from communications "intended for

7  that user[,]" in this case, email messages sent to Subscribers.  Plaintiffs do not have claims under

8  the Stored Communications Act because Subscribers provided the necessary authorization.  And

9  again, to the extent ZoomInfo is obtaining more information than disclosed to Subscribers,

10  Wysocki and Sidhu do not have standing to enforce those agreements because they themselves

11  are not Subscribers, and not party to the disclosures that might create a legally protected interest

12  capable of enforcement.

13      The Court turns next to Plaintiff Kellogg, who must have suffered an injury in fact fairly

14  traceable to ZoomInfo's conduct and redressable under the law.  Allegations specific to Kellogg

15  are few and far between in the complaint.  Plaintiffs allege Kellogg is a citizen of California and

16  a small business owner of a brand marketing and graphic design service who was unaware of

17  ZoomInfo's data scraping practices; specifically, ZoomInfo allegedly viewed, scanned, and read

18  her personal and confidential communications without her consent and knowledge.  (Dkt. No. 19

19  at 9, 24.)  The complaint does not explain how Kellogg knows her information was viewed,

20  scanned, and read, nor does the complaint allege Kellogg's information was actually posted on

21  the database.  (*See generally,* Dkt. No. 19.)

22      Most notably, Kellogg is a subscriber to ZoomInfo, but not a subscriber to CEP, meaning

23  she pays for a subscription to view and access the information on the database, but she was in no

24

ORDER ON MOTION TO STRIKE CLASS ALLEGATION AND MOTIONS TO DISMISS (DKT. NOS. 21, 22, 78) - 20

1    way involved in consenting to CEP or installing CC on her computer in exchange for a free

2    subscription.  In this way, while she did pay for a subscription to ZoomInfo, she is not a

3    Subscriber as used within the complaint or this opinion.  Plaintiffs argue this does not matter:

4    "her breach of contract claim remains the same because the Terms of Service and Privacy Policy

5    are applicable to paid and free users alike, and ZoomInfo's interception of Plaintiff Kellogg's

6    emails via correspondence with Contact Contributor users breaches those contracts regardless of

7    her subscription status."[2]  (Dkt. No. 94 at 13.)  Plaintiffs explain paid subscribers like Kellogg

8    are subject to the very same Terms and Conditions as CEP users, and, accordingly, Kellogg

9    suffered the same injuries as any other Subscriber, paid or otherwise: ZoomInfo's unlawful

10    interception of her emails in violation of the Wiretap Act and Stored Communications Act.  (*Id.*

11    at 17.)

12            Kellogg's information does appear to have existed at some point on the database.  (Dkt.

13    No. 95-7.)  But Kellogg was never a subscriber of CEP and never downloaded or installed CC in

14    exchange for access to ZoomInfo's database.  (Dkt. No. 80 at 2–4.)  When she paid for her

15    subscription, Kellogg agreed to the ZoomInfo License Terms and Condition.  (*Id.* at 7.)  This is

16    an entirely separate and completely unrelated agreement to the Terms of Use and Privacy Policy

17    associated with the agreement to become a Subscriber to CEP in exchange for free access to the

18    database.  Kellogg's purchase order states: "This Order and the [ZoomInfo License Terms and

19    Conditions] together constitute the entire agreement between ZoomInfo and Licensee governing

20    the products and services referenced above (the "Agreement"), to the exclusion of all other

21    terms."  (Dkt. No. 80 at 7.)  In short, as a Non-Subscriber to CEP, Kellogg has no more of a legal

22

23

24

---

[2] The referenced breach of contract claim, a claim under Washington law, has already been stricken for Plaintiffs' failure to put forth a Washington-citizen Plaintiff.

1   right to enforce CEP's Terms of Use and Privacy Policy as Wysocki and Sidhu because all three

2   Plaintiffs are not parties to those agreements.  For the same reasons Wysocki and Sidhu lack

3   standing, Kellogg also lacks standing.[3]

4          The final named Plaintiff, Flemister, is a published writer and owner of  a writing

5   business "Mirror Life Writing, Inc."  (Dkt. No. 19 at 24.)  She has never subscribed to ZoomInfo

6   or used any ZoomInfo service, yet her business is displayed on ZoomInfo's platform.  (*Id.*)

7   Initially, her business profile contained the wrong information and linked her to a similarly

8   named adult website as the website associated with her business.  (*Id.*)  ZoomInfo publicly

9   displayed her residential property as the business headquarters of the adult business.  (*Id.*) The

10  inclusion of her information without her consent or authorization, some of which is incorrect, has

11  caused and has the potential to cause Plaintiff Flemister embarrassment and loss of business.

12  (*Id.*)

13         Unlike Wysocki and Sidhu, there is no evidence indicating where or how ZoomInfo

14  obtained Flemister's business information.  Flemister requested deletion of her data, and

15  ZoomInfo complied with that request.  (Dkt. No. 94 at 10.)  The parties disagree as to whose

16  fault it is that Flemister's data is gone and that the parties cannot pinpoint how the inaccurate

17  information was obtained and posted.  But where the information was obtained is inapposite.  As

18  a Non-Subscriber, Flemister lacks standing to enforce the Terms of Use and Privacy Policy just

19  like Wysocki and Sidhu.  Even if Flemister's information was obtained through CEP and CC,

20

21  _____

22  [3] Kellogg initially obtained her subscription to the database via a free trial.  Neither party is
    aware of whether a free trial requires the user to agree to participate in CEP or download CC.
23  (Dkt. No. 94 at 17 n.11.)  Any argument Kellogg might have agreed to the CEP Terms of Use to
    obtain her free trial are therefore wholly speculative, and the Court refuses to find standing on
24  this ground without additional evidence that Kellogg in fact agreed to participate in CEP or
    downloaded CC, thereby agreeing to the Terms of Use and Privacy Policy.

ORDER ON MOTION TO STRIKE CLASS ALLEGATION AND MOTIONS TO DISMISS (DKT. NOS. 21, 22,
78) - 22

because Flemister cannot enforce the Terms of Use and Privacy Policy against ZoomInfo as a Non-Subscriber, she does not have standing to challenge ZoomInfo's deceptive or misleading level of "scraping" as alleged in the complaint.  If her information was obtained through CEP, the Subscribers she emailed consented to ZoomInfo's "scraping" of her information from those emails.  If her information was not obtained through CEP, then her injury is irrelevant to this suit entirely.

And, although she lost business and her reputation was damaged because of her association with the adult website, those injuries necessarily challenge the accuracy of the information posted, which is not the injury Plaintiffs continually assert.  "While the complaint does allege that ZoomInfo published Plaintiffs' information and that the mix[-]up regarding Plaintiff Flemister's business damaged her reputation, those are not the injuries giving rise to Plaintiffs' claims nor the injuries which Plaintiffs seek to remedy via this Action." (Dkt. No. 94 at 13) (citations omitted).  As Defendants explain:

> Another way of seeing how Plaintiff Flemister is claiming no injury relating to Contact Contributor's "scan[ning], read[ing], or otherwise review[ing] the contents of [her] email correspondence," is to imagine that ZoomInfo had accurately displayed all relevant business information.  In that case, Plaintiff Flemister—on her own telling—would have suffered no injury, and yet the operation of Contact Contributor would have been exactly the same.

(Dkt. No. 78 at 12 n.5) (citations omitted).

For the same reason Wysocki, Sidhu, and Kellogg lack standing to bring the federal claims, Flemister lacks standing under the same statutes.  Both the Wiretap Act and Stored Communications Act carve-out exceptions where one party to the communication authorized or consented to the interception.  Subscribers authorized the interception of Non-Subscribers' emails.  None of the named Plaintiffs were party to that authorization, and therefore cannot enforce its terms.  Plaintiffs lack standing under their Wiretap Act claim (Claim 1) and Stored

1   Communications Act claim (Claim 2).  Defendants' motion to dismiss those claims is therefore

2   **GRANTED.**

3           2.   Remaining state claims

4        With Plaintiffs' lacking standing under the federal claims (Claims 1 and 2) and having

5   stricken state claims for which there is no named Plaintiff (Claims 3, 4, 5, 10, 11, 12), the

6   remaining claims are Wysocki and Sidhu's Connecticut claim (Claim 13), Flemister's Georgia

7   claim (Claim 14), and Kellogg's California claims (Claims 6, 7, 8, 9).  ZoomInfo argues each

8   fails as a matter of law. (Dkt. No. 22 at 19–21.)

9             *i.   Connecticut*

10       Wysocki and Sidhu's claim under the Connecticut Unfair Trade Practices Act

11  ("CUTPA") is founded on allegations of ZoomInfo's failure to properly disclose its business

12  practices in its Terms of Use and Privacy Policy, which give several explicit assurances

13  ZoomInfo does not view or read email content.  (Dkt. No. 19 at 57.)  The CUTPA states "no

14  person shall engage in unfair methods of competition and unfair or deceptive acts or practices in

15  the conduct of any trade or commerce[.]"  Conn. Gen. Stat. § 42-110b(a).   Here, the alleged

16  harm is ZoomInfo's unfair or deceptive business practices, failure to disclose its material terms

17  and failure to obtain proper consumer consent to CEP and CC.  (Dkt. No. 19 at 57–58.)

18       As with their federal claims, Wysocki and Sidhu, as non-subscribers, did not agree to the

19  Terms of Use or Privacy Policy.  They do not have standing to enforce those agreements, and

20  therefore lack standing under the CUTPA.  The complaint even acknowledges this when it

21  alleges ZoomInfo failed to inform users "ZoomInfo does, in fact, view the entirety of

22  Subscribers' incoming and outgoing communications to extract and include information in their

23  database. This is also true for unsuspecting non-users, who never subscribed or interacted with

24

ZoomInfo and have no way of knowing, and thus consenting to ZoomInfo's interception."  (Dkt. No. 19 at 58.)  While it may be true that non-users have no way of knowing and consenting to ZoomInfo's interception, Subscribers to CEP do.  And while it may be true that ZoomInfo is engaging in unfair business practices by including deceptive descriptions of what CEP and CC will obtain and who will view it, that is a claim to be brought by a Subscriber—not a non-subscriber like Sidhu and Wysocki.

To the extent Plaintiffs claim misrepresentations in communications outside these agreements, such as in ZoomInfo's websites or "advertising" (*see* § 42-110a(4)), the Plaintiffs have not alleged a redressable injury under CUTPA because they assert no ascertainable loss of money or property as part of their injuries.  "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages." § 42-110g(a).

Plaintiffs do not have standing under CUTPA and therefore that claim (Claim 13) is **DISMISSED**.

> ii.   *Georgia*

As the Plaintiffs' Georgia representative, Flemister also sued under the Georgia Uniform Deceptive Trade Practices Act  ("GUDTPA"). Ga. Code § 10-1-370, *et seq.*  As its name suggests, GUDTPA affords relief to those who are injured by a "deceptive trade practice" of another.  *Churches United With Israel, Inc. v. Franklin*, No. 2:20-CV-00156-RWS, 2021 WL 2478573, at *9 (N.D. Ga. May 17, 2021).  Defendants argue Plaintiffs' claim under GUDTPA fails on the merits because the allegation that ZoomInfo misrepresents its practices must meet the heightened pleading standard of Rule 9(b)—explaining "the who, what, when, where, and how"

of the alleged fraud.  (Dkt. No. 22 at 25).  This Court disagrees and finds GUDTPA more

analogous to the Lanham Act than to actions for fraud.

GUDTPA, which largely deals with trademark regulation, prohibits deceptive trade

practices committed "in the course of business," including "represent[ing] that goods or services

have . . . characteristics, . . . uses, [or] benefits . . . that they do not have"; "[r]epresent[ing] that

goods or services are of a particular standard, quality, or grade . . . if they are of another"; and

"[e]ngag[ing] in any other conduct which similarly creates a likelihood of confusion or of

misunderstanding."  Ga. Code § 10-1-372(a)(5), (7), (12); *see Grumet v. Prof'l Acct. Mgmt.,*

*LLC*, 2013 WL 12382693, at \*12 (N.D. Ga. Dec. 18, 2013) ("Like the Lanham Act, section 10-1-

372 primarily deals with trade practices that are likely to cause confusion in the marketplace,

such as passing off goods or creating a false impression as to the source, sponsorship or approval

of goods.").

Notably, and unlike the Connecticut statute, GUDTPA does not require a complainant be

an actual customer of the deceiving person or corporation.  "[T]he 'consumer' issue is irrelevant

to standing under Georgia's GUDTPA.  Rather, the plaintiff must be a person as defined by the

GUDTPA who is likely to be injured by the defendant's deceptive trade practice."  *In re*

*Johnston Indus., Inc.*, 300 B.R. 821, 826 (Bankr. M.D. Ga. 2003).  This means that, despite not

being a Subscriber to CEP, Flemister may still maintain standing against ZoomInfo under the

GUDTPA.

But Flemister's claim does not appear to "fit" the types of conduct GUDTPA prohibits.

GUDTPA defines twelve situations where a person engages in "deceptive trade practices"

actionable under the statute.  Plaintiffs point to subsections (5), (7), and (12); of these, (5) and (7)

do not appear to apply to Flemister's complaint.  Subsection (5) prohibits persons from

"[r]epresent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have[.]" Ga. Code § 10-1-372(a)(5).  Subsection (7) prohibits ZoomInfo from "[r]epresent[ing] that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another[.]"  Ga. Code § 10-1-372(a)(7).  Neither of these subsections appear to apply to ZoomInfo's Terms and Conditions or advertisements for CEP, as any alleged omission as to the extent CC "scrapes" their email would not fall under CEP's "standard," "quality," "style," "characteristics," "ingredients," "uses," or "benefits."  Subsection (12) appears to be a better fit, prohibiting ZoomInfo from "[e]ngag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."  Although "likelihood of confusion or of misunderstanding" is not defined, it mirrors "likelihood of confusion" under the Lanham Act.  *ITT Corp. v. Xylem Grp., LLC*, 963 F. Supp. 2d 1309, 1327 (N.D. Ga. 2013) ("Whether confusion occurs under [GUDTPA] requires the same 'likelihood of confusion' analysis found in trademark-infringement claims under the Lanham Act.").  As such, GUDTPA movants "need[] to establish . . . 'that the use of a name causes confusion to others [who are] using reasonable care.'" *Id.* (citing *Eckles v. Atlanta Tech. Grp., Inc.,* 485 S.E.2d 22, 24 (Ga. 1997)).  Based on this, Flemister's claim does not appear to be addressed by GUDTPA, which relates to trademark infringement and confusion between sources of goods in the marketplace.

Even if Flemister's "confusion" as to what extent ZoomInfo collects and reads information through CEP met the relevant definitions for "deceptive trade practices" under GUDTPA, the statute provides injunctive relief only to "[a] person likely to be damaged by a deceptive trade practice of another." Ga. Code § 10-1-373; *Terrill v. Electrolux Home Prod.,*

1    *Inc.*, 753 F. Supp. 2d 1272, 1291 (S.D. Ga. 2010) (dismissing GUDTPA claims where Plaintiffs

2    failed to allege how they will be damaged in the future absent an injunction targeted at

3    defendant's advertising campaigns).  Instead, the complaint asserts the following past-tense

4    injury under its GUDTPA claim: "[t]he foregoing unfair and deceptive practices directly,

5    foreseeably and proximately **caused** Plaintiffs and the Class to suffer loss and substantial injury

6    and Plaintiffs and the Class are entitled to recover damages and appropriate relief, as requested

7    below[.]"  (Dkt. No. 19 at 61) (emphasis added).

8          Plaintiffs' response to the motion to dismiss provides no further context.  It merely

9    addresses GUDTPA by fleeting reference under its argument for the "consumer protection laws,"

10   arguing it meets the elements of Washington's Consumer Protection Act, which it deems

11   "materially comparable to the consumer protection statutes of . . . Georgia, and so Plaintiffs have

12   focused their argument on Washington's statute as an example intended to apply to all of these

13   statutes." (Dkt. No. 37 at 21.)  This Court disagrees.  Flemister has failed to plead or provide

14   explanation for how her claim is redressable under GUDTPA, and it is therefore **DISMISSED.**

15                    *iii.*    *California*

16                         a.    CIPA

17         Under the California Invasion of Privacy Act (CIPA), it is unlawful to intentionally,

18   willfully, and without consent, intercept a communication and use the information without

19   consent.  "The analysis for a violation of CIPA is the same as that under the federal Wiretap

20   Act."  *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1051 (N.D. Cal. 2018) (citation omitted).

21   CIPA, however, requires "consent of all parties to the communication."  Cal. Penal Code

22   § 631(a).  Both Subscribers and Non-Subscribers would thus need to consent to ZoomInfo's

23   "scraping" under CIPA.

24

1     The California Supreme Court identifies the three operative clauses protecting against

2  "three distinct and mutually independent patterns of conduct" under CIPA: (i) "intentional

3  wiretapping," (ii) "willfully attempting to learn the contents or meaning of a communication in

4  transit over a wire," and (iii) "attempting to use or communicate information obtained as a result

5  of engaging in either of the two previous activities."  *Annette Cody, v. Ring, LLC et al.*, No. 23-

6  CV-00562-AMO, 2024 WL 735667, at *2 (N.D. Cal. Feb. 22, 2024).  ZoomInfo argues Plaintiffs

7  fail to meet the "in transit" requirement because Plaintiffs allege the interceptions occurred

8  during transmission in a conclusory manner.  (Dkt. No. 22 at 21.)  Plaintiffs allege: "[t]his

9  interception occurred during transmission, as ZoomInfo operates in real time to acquire the

10  content of Plaintiffs' and Class Members' electronic communications" and "ZoomInfo intercepts

11  communications while 'in transit' and thus are in violation of the Wiretap Act."  (Dkt. No. 19 at

12  31, 34.)

13     This is sufficient to survive a motion to dismiss.  *Campbell v. Facebook Inc.*, 77 F. Supp.

14  3d 836, 841 (N.D. Cal. 2014) ("While Facebook may ultimately produce evidence showing that

15  the messages were actually accessed while in storage, not during transmission, that issue is

16  premature at this stage of the case, and would be better addressed as part of a motion for

17  summary judgment with a more developed factual record.").  Defendants' motion to dismiss is

18  therefore **DENIED** with respect to the CIPA claim.

19              b.  <u>Intrusion Upon Seclusion & Invasion of Privacy</u>

20     Claim 7 is the common law tort of intrusion upon seclusion and Count 6 is invasion of

21  privacy in violation of the California Constitution, Art. I, Sec. 1. Consol.  Because the standards

22  for these two causes of action "are closely related," courts "treat[] them together."  *In re Google*

23  *Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 830 (N.D. Cal. 2020).

24

"The California Constitution and the common law set a high bar" for an intrusion to be actionable. *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012) (collecting cases). Many courts have found the collection and even disclosure to certain third parties of personal information about the users of a technology may not constitute a sufficiently "egregious breach of social norms" to make out a common law or constitutional privacy claim. *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d at 830; *In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 988 (N.D. Cal. 2014) (no intrusion claim based on Google's collection and disclosure of users' data, including their browsing histories); *Low*, 900 F. Supp. 2d at 1025 (finding that LinkedIn did not commit a "highly offensive" invasion of users' privacy by disclosing users' browsing histories to third parties); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (finding no invasion of privacy based on Defendants' disclosure of each user's addresses, geolocation, the unique device identifier assigned to the user's device, gender, age, time zone, and information about app usage). These courts have characterized the collection and disclosure of such data as "routine commercial behavior." *Low*, 900 F. Supp. 2d at 1025.

To prove actionable intrusion, Plaintiffs must show the Defendant penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff. *Shulman v. Grp. W Prods., Inc.*, 955 P.2d 469, 490 (Cal. 1998), *as modified on denial of reh'g* (July 29, 1998). And, the invasion must be "serious." "Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an *egregious breach* of the social norms underlying the privacy right." *Hill v. Nat'l Collegiate Athletic Assn.*, 865 P.2d 633 (Cal. 1994) (holding that rules requiring college football players to submit to drug testing were not egregious breaches of the social norms) (emphasis added). Even

1     negligent conduct that leads to theft of highly personal information, including social security

2     numbers, does not "approach [the] standard" of actionable conduct under the California

3     Constitution and thus does not constitute a violation of Plaintiffs' right to privacy.  *See Ruiz v.*

4     *Gap, Inc.,* 540 F. Supp. 2d 1121, 1127–1128 (N.D. Cal. 2008) *aff'd,* 380 Fed. Appx. 689 (9th

5     Cir. 2010).

6           In *Low*, the Plaintiffs' claims under intrusion and invasion were dismissed because there

7     was no "serious invasion" where LinkedIn disclosed to third parties data of a user's browsing

8     histories.  *Low*, 900 F. Supp. 2d at 1025.  One of the reasons the court dismissed the claim was

9     the Plaintiffs only postulated what information third parties obtained and what was done with

10    that information, failing to establish the conduct "amount[ed] to a serious invasion" of the

11    protected privacy interest.  *Id.*

12          Here, Plaintiffs similarly rely on conjecture—they plead no facts demonstrating what

13    information ZoomInfo is viewing or obtaining from their emails.  The collection and disclosure

14    of user info in the above cases also did not involve a situation in which one of the parties to a

15    private conversation consented to some disclosure to a third party.  Here, Subscribers consented

16    to ZoomInfo invading an otherwise private communication and obtaining certain information.

17    This conduct does not appear to rise to the same level of an "egregious breach" of the social

18    norms underlying the privacy right.  As plead, Kellogg does not meet the "high bar" to plead a

19    viable claim under intrusion upon seclusion or invasion of privacy in violation of the California

20    Constitution.  ZoomInfo's motion to dismiss these two claims is therefore **GRANTED.**

21                        c.   <u>UCL</u>

22          Plaintiffs' final California claim (Claim 9) alleges violation of the California Unfair

23    Competition Law (UCL).  (Dkt. No. 19 at 19); Cal. Bus. & Prof. Code §17200.  "Unfair

24

competition" means "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. &
Prof. Code § 17200.  The California Supreme Court has held that § 17200 "defines 'unfair
competition' very broadly, to include 'anything that can properly be called a business practice
and that at the same time is forbidden by law.'" *Farmers Ins. Exch. v. Superior Court*, 826 P.2d
730, 742 (1992) (internal quotation marks omitted) (quoting *Barquis v. Merchant Collection
Ass'n*, 496 P.2d 817, 830 (1972)).  "By proscribing 'any unlawful' business practice, the UCL
permits injured consumers to 'borrow' violations of other laws and treat them as unlawful
competition that is independently actionable." *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp.
3d 1197, 1225 (N.D. Cal. 2014).  To have standing to bring suit pursuant to § 17200, a plaintiff
must "make a twofold showing: he or she must demonstrate injury in fact and a loss of money or
property caused by unfair competition." *Susilo v. Wells Fargo Bank, N.A.*, 796 F. Supp. 2d
1177, 1195–1196 (C.D. Cal. 2011).

Kellogg, the Plaintiff representative for California, asserts no loss of money or property
caused by ZoomInfo's conduct.  The complaint devoid of economic injury, the Plaintiffs do not
have standing under the UCL and ZoomInfo's motion to dismiss that claim is **GRANTED.**

### 3.  Rule 8

Finally, Defendants argue Plaintiffs failed to provide notice under Rule 8 by asserting
allegations against all ZoomInfo Defendants, "lump[ing] four different corporate entities
together without identifying which one did what." (Dkt. No. 22 at 31.)  Plaintiffs argue this is an
issue to be vetted in discovery.  (Dkt. No. 37 at 30.)

Plaintiffs' allegations must "provide sufficient notice to all of the Defendants as to the
nature of the claims being asserted against them," including "what conduct is at issue." *Briskin
v. Shopify Inc.*, No. 21-CV-06269-PJH, 2022 WL 1427324, at *3 (N.D. Cal. May 5, 2022), *aff'd,*

87 F.4th 404 (9th Cir. 2023).  With only one remaining claim, all four Defendants are certainly aware of what conduct Plaintiffs allege against them.  ZoomInfo's Rule 8 argument is rejected and the motion to dismiss on that ground is **DENIED.**

\* \* \*

Plaintiff's final claim is a Request for Relief under the Declaratory Judgement Act (Claim 15), which does not apply where there is no underlying case or controversy within this Court's federal jurisdiction.  (Dkt. No. 19 at 61–63); 28 U.S.C. § 2201(a).  All claims have been dismissed or stricken other than Kellogg's CIPA claim (Claim 6).

Ordinarily, with one remaining state claim, the Court would decline to exercise supplemental jurisdiction.  28 U.S.C. § 1367(c)(3).  However, Plaintiffs have claimed subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA") because (i) at least one Plaintiff was a citizen of a different state than the Defendants; (ii) the amount in controversy exceeded $5,000,000; and (iii) there were at least 100 individuals in the putative class that Plaintiffs seek to represent through this action. (Dkt. No. 19 at 7); 28 U.S.C. § 1332(d).

Even with the single CIPA claim remaining, Kellogg is a citizen of California, and ZoomInfo's principal place of business is in Washington, maintaining diversity.  (Dkt. No. 19 at 9–10).  Whether the amount in controversy still exceeds $5,000,000 and whether there are at least 100 individuals in the California class remains to be seen, but the Court is skeptical the CIPA violations meet these standards at $5,000 per violation or three times the amount of actual damages, if any, sustained by the plaintiff.  Cal. Penal Code § 637.2(a)(1) and (2).  But without more information as to the amount of claimed damages and number of class members specific to California, this Court is without a sufficient basis to grant or reject jurisdiction under CAFA.

1    The Court therefore **ORDERS** Plaintiffs to show cause as to whether the remaining claim

2    meets CAFA's requirements for this Court to maintain jurisdiction.

3       **C.   Leave to amend**

4       Nowhere in its three responses in opposition to Defendants' motion to strike, motion to

5    dismiss, and renewed motion to dismiss did Plaintiffs request leave to amend their complaint for

6    a third time.  A district court does "not abuse its discretion in denying [a plaintiff] leave to

7    amend [their] complaint" if the plaintiff merely requests leave to amend, without identifying

8    what additional facts they would include or "otherwise explain[ing] why the amendment would

9    not be futile." *Foskaris v. Experian Info. Sols., Inc.*, 808 F. App'x 436, 439–440 (9th Cir. 2020)

10   ("It is not the court's duty, however, to peruse the record to formulate the parties' arguments.");

11   *see also Chang v. Noh*, 787 F. App'x 466, 467 (9th Cir. 2019) (holding district court did "not

12   abuse its discretion by denying [a plaintiff's] request for leave to amend a second time" if the

13   plaintiff merely requested leave "in his opposition to the Rule 12(b)(6) motion" and "provided no

14   supporting argument or authority for why leave to amend should be granted"); *Kendall v. Visa*

15   *U.S.A., Inc.*, 518 F.3d 1042, 1052 (9th Cir. 2008) ("Appellants fail to state what additional facts

16   they would plead if given leave to amend . . . . Accordingly, amendment would be futile.").

17      With no explanation as to how the complaint's deficiencies would be cured by

18   amendment, the Court declines to grant leave to amend.

19             **IV     CONCLUSION**

20      Accordingly, and having considered Defendants' motion, the briefing of the parties, and

21   the remainder of the record, the Court finds and ORDERS:

22      1.  Defendants' Motion to Strike Class Allegations (Dkt. No. 21) is **GRANTED IN**

23          **PART AND DENIED IN PART**;

24

2.  Defendants' Motion to Dismiss (Dkt. No. 22) is **GRANTED IN PART AND DENIED IN PART**;

3.  Defendants' Renewed Motion to Dismiss for Lack of Standing (Dkt. No. 78) is **GRANTED**;

4.  Plaintiffs' Motion to Seal (Dkt. No. 93) is **GRANTED;**

5.  Plaintiffs' Claims 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 13, and 14 of the Second Amended Complaint (Dkt. No. 19) are **DISMISSED**.

6.  Plaintiffs are not permitted leave to amend the complaint.

7.  As there is only one remaining state law claim (Claim 6), Plaintiffs are **ORDERED** to show cause no later than March 25, 2024 why this matter should not be dismissed for lack of subject matter jurisdiction.

Dated this 15th day of March 2024.

David G. Estudillo
United States District Judge